IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| VIRTUA HEALTH, INC., | : |
| | : |
| Petitioner, | : CIVIL ACTION NO. _____ |
| | : |
| v. | : **PETITION TO VACATE** |
| | : **ARBITRATION AWARD** |
| JNESO DISTRICT COUNCIL 1, IUOE, | : |
| | : |
| Respondent. | : |

PETITIONER, by and through its attorneys, BALLARD SPAHR LLP, for its Petition to Vacate Arbitration Award, alleges as follows:

## JURISDICTION

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 29 U.S.C. § 185 ("LMRA"), and the provisions of the Federal Arbitration Act, 9 U.S.C. § 1 ("FAA").

## VENUE

2. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to this claim occurred in Voorhees, New Jersey.

## PARTIES

3. Petitioner is a not for profit corporation incorporated under the laws of the State of New Jersey and authorized to do business in New Jersey. Petitioner's corporate offices are located at 303 Lippincott Drive, Marlton, New Jersey 08053

and one of its principal places of business is its acute care hospital located at 200 Bowman Drive, Voorhees, New Jersey.  Petitioner is an employer within the meaning of Section 2(2) of the National Labor Relations Act, 29 U.S.C. § 152(2).

4. Respondent is a labor organization with offices at 1225 Livingston Avenue, North Brunswick, New Jersey.  Respondent is a labor organization within the meaning of Section 2(5) of the National Labor Relations Act 29 U.S.C. § 152(5).

5. Petitioner is one of southern New Jersey's largest healthcare systems, serving the public in a variety of healthcare settings.  The system includes three acute care hospitals, in Voorhees, Marlton and Mt. Holly, numerous outpatient facilities, short term and long term care centers, freestanding emergency departments, ambulatory surgery centers, employed physicians, physicians' practices, home health agencies, and eight urgent care centers.  The Voorhees acute care hospital ("Voorhees Hospital") operates a neonatal intensive care unit ("NICU").  The NICU provides comprehensive and sophisticated care for infants born prematurely.  The NICU is a "Level III B" (of IV) meaning that it is equipped to treat extremely premature infants who require intensive care.  It is the only such facility in southern New Jersey.

6. Respondent Union is the collective bargaining agent for a bargaining unit of registered nurses employed at many of Petitioner's facilities, including the registered nurses working in the Voorhees Hospital's NICU.

7. Petitioner and Respondent currently are parties to a collective-bargaining agreement effective March 1, 2018 to February 28, 2021. The grievance involved herein arose under the parties' 2015 to 2018 collective-bargaining agreement ("CBA"). A true and accurate copy of the CBA is annexed to the Certification of Denise M. Keyser, Esquire (the "Certification") as Exhibit 1. The Certification is filed with this Petition. The CBA and the parties' current collective-bargaining agreement do not differ in any relevant way for purposes of this Petition.

## NATURE OF THE ACTION

8. On or about June 28, 2017, Respondent Union filed a grievance alleging that Petitioner's NICU had engaged in an "unjustified denial of PTO [Paid Time Off]" requests by registered nurses represented by Respondent. A true and accurate copy of the grievance is annexed to the Certification as Exhibit 2. The grievance challenged Petitioner's decision to reduce the number of available NICU PTO shifts per week from eleven to nine on the day shift, with the same reduction for the night shift. In effect, the grievance challenged Petitioner's determination as to the number of nurses to be staffed on the NICU.

9. The grievance was denied under the CBA's grievance procedure, and was referred to arbitration before Arbitrator Daniel F. Brent.

10. An arbitration hearing occurred on July 11 and August 16, 2018. Both parties submitted post-hearing briefs to the Arbitrator. The Arbitrator issued the Award sustaining Respondent's grievance. A true and accurate copy of the Award is annexed to the Certification as Exhibit 3.

11. The Arbitrator held that Petitioner violated the CBA because its decision to reduce the number of available PTO slots during the "summer peak season" in 2017 and 2018 was "predicated on flawed mathematics and incomplete evaluation of the information necessary to make a reasonable prediction" of staffing needs, and that this alleged deficient methodology "created an exception under the language of Article 5.1, the Management Rights clause[,] and Article 28.2, granting the Employer the sole right to set staffing levels, except as limited elsewhere in the collective bargaining agreement[.]"

12. The Arbitrator ruled that Petitioner must utilize "appropriate competent mathematical methodology" to calculate the staffing "necessary" for the NICU and staff accordingly.

13. Petitioner had calculated what it determined to be appropriate and safe staffing levels within the NICU based upon the NICU's yearly average daily census ("ADC") for 2015 and 2016, while taking into account medical and other

leaves of absence year over year.  Using this method, it arrived at an estimate of the number of registered nurses needed on average for each shift in the NICU throughout the year: 16.  *See* Exhibit 3 at 12, and Petitioner's Second and Third Step Responses to the grievance, annexed to the Certification as Exhibit 4.

14.     In Petitioner's judgment and experience, this number gave it sufficient ability to staff adequately and safely, and to staff up or down from that core number for each shift, depending on actual daily census (number of patients) and acuity (level of nursing care required for each patient).

15.     The Arbitrator substituted his judgment for Petitioner's concerning the appropriate and safe staffing of the NICU, and held – without any evidence that patient population and acuity were seasonal or predictable on a day to day, week to week, or month to month basis – that Petitioner must staff based upon the following:

(a)     It must make separate calculations for the peak and non-peak times;

(b)     It must take into account historic patient census and acuity levels and must somehow consider "the actual acuity of a patient census on any given day" although PTO decisions for the peak season are made months in advance, and PTO grants for off-peak are made up to 24 weeks in advance;

(c) It cannot take into account historic data concerning leaves of absence;

(d) It must take into account the number of nurse "cancellations" or those scheduled but not needed each day throughout the year. *See* Exhibit 3 at 11-12.

16. No evidence is cited in the Award, nor was any introduced in the hearing, that calculating the nurses needed using the above considerations would result in a more accurate prediction of the minimum number of nurses required on a "daily, weekly or monthly" basis (*See* Exhibit 3, at 13), or whether, if Petitioner could make these predictions, such would result in safe and adequate staffing, and permit the Petitioner to react quickly to unexpected surges in NICU population and/or acuity on any given day. Moreover, the CBA does not require that the NICU be staffed with the bare minimum number of nurses "necessary."

17. The Arbitrator ordered as a remedy that the NICU allow no fewer than eleven PTO shifts per week for each of the day and night shifts throughout 2019 (and staff accordingly), and that Petitioner, for 2020 and beyond, must "determine the maximum available vacation PTO shifts . . . in accordance with valid mathematical methodology and using appropriate statistical data" as the Arbitrator set forth in the Award. Presumably, the NICU must staff to this minimum staffing number and grant the "maximum" possible PTO shifts. *See* Exhibit 3 at 18.

18. Section 5.1 of Article 5 ("Management Rights") reads:[1]

> 5.1     The management and operation of the enterprise and the direction of the work force are vested exclusively with the Employer.  ***The Employer retains all of the power, rights, functions, responsibilities and authority to operate its business and direct its employees except as limited by express language of this Agreement***.  ***The rights reserved to the Employer include all matters of inherent managerial policy including those necessitated by the unique nature of Employer's operations***. Prominent among the rights reserved to and retained by the Employer . . . are the sole right to . . . ***establish and change work schedules and assignments; to exercise control and direction over the organization and effectiveness of operations; to determine the number of employees*** and duties to be performed by them as registered nurses; ***to determine and implement standards related to . . . operations and patient care; to determine and change work shifts, schedules, rotations and starting and quitting times;*** and in all respects to carry out the ordinary and customary functions of management whether or not possessed or exercised by the Employer prior to the execution of this Agreement.  ***The Employer reserves the right to . . . to determine the number and types of employees required, and to otherwise take such measures as management may determine to be necessary to the orderly or economical operation of the business.***

19. Section 28.2 of Article 28 ("Staffing") reads:

> 28.2   Appropriate staffing levels will be based on the New Jersey Hospital Licensing Standards, NJAC, Title 8, Chapter 43G. and ***shall be within the sole discretion of the Employer***.

---

[1] Emphasis has been added to the Agreement's provisions reproduced in this Petition.

20. Section 9.2 of Article 9 ("Arbitration") reads:

> 9.2 The arbitrator shall be bound by the terms of the Agreement ***and shall not have jurisdiction to add to, modify, vary, change or remove any terms of this Agreement.***

21. Section 47.1 of Article 47 ("Scheduling and Availability") reads:

> 47.1 Scheduling Procedure:
>
> a. The Hospital will post a six (6) week preliminary schedule five (5) weeks before the start of the schedule indicating the staffing for full and part-time RNs. Requests for PTO must be submitted in writing to the manager/supervisor on the approved request form no sooner than twenty four (24) weeks before the start of the week in which the time is requested and no later than six (6) weeks prior to the start of the applicable schedule (i.e., the schedule covering the week in which the time is requested), except for the months of June, July, August and September. Requests will be responded to in writing within fourteen (14) days.
>
> b. 1. PTO requests for the peak vacation period of June 15th through September 15th shall be submitted in writing, by January 31st, and be responded to by March 1st. Requested PTO for the peak vacation period of June 15 through September 15 may not exceed the employee's cumulative total of scheduled hours per pay period (maximum of two work weeks, as defined in Section 17.1). Employees requesting two (2) work weeks must indicate their first and second choice weeks. Approval shall be granted, by seniority preference, for one week in an effort to grant as many employees in the unit as possible at least one work week off during the peak vacation period. Management will then consider requests for a second work week, again in seniority order. In the event of a conflict among employees on first or second choice weeks, management will communicate with the employees involved. Requests for individual PTO days

> during the peak vacation period will be considered thereafter. ***PTO requests are subject to management approval.*** Both the Employer and the Union urge employees to work toward an equitable distribution of PTO time within each unit during the peak vacation period.
>
> 2. All other vacation (PTO) requests including the peak vacation period from June 15th through September 15th, received after January 31st, shall be addressed on a "first-come, first-served" basis, and need not be on a work week basis.
>
> 3. Requests received from multiple nurses at the same time, for the same time, will be approved on a seniority basis.

22. Petitioner complied fully with the provisions of Section 47.1. *See* Exhibit 3 at 16. Section 47.1 does not require that a set amount of PTO be granted.

23. Sections 5.1 and 28.2 of the CBA grant Petitioner the sole discretion to set staffing levels in the NICU, and do not require a set number of nurses per shift, that a particular staffing formula or calculation be employed, or that staffing be set at the minimum "necessary" level.

24. Therefore, in rendering the Award, the Arbitrator exceeded the scope of his authority under the CBA, and rendered an award against Petitioner which fails to draw its essence from the CBA. The Arbitrator may not substitute his judgment for Petitioner's in determining a safe and sufficient staffing level for the NICU or the amount of PTO which should be granted given that staffing level. Nor may the Arbitrator require that Petitioner engage in a specific calculation –

devised by the Arbitrator – in determining its staffing needs. Nor may the Arbitrator ignore the clear and unambiguous language of the CBA which recognizes the "unique nature of the Employer's operations" and which recognizes that "appropriate staffing levels" are "within the sole discretion of the Employer."

## CLAIM FOR RELIEF

WHEREFORE, Petitioner prays that the Court:

1. Set aside and vacate the Award of Arbitrator Brent;

2. Award Petitioner the costs of the suit incurred; and

3. Award Petitioner such other further relief as this Court deems appropriate.

Dated:   January 25, 2019

/s/ Denise M. Keyser
Denise M. Keyser (026471983)
BALLARD SPAHR LLP
210 Lake Drive East, Suite 200
Cherry Hill, NJ  08002-1163
Telephone: 856.761.3400

Attorneys for Petitioner, Virtua Health, Inc.